In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 03-4337

NDERIM FETO, MATILDA FETO,
ENDRI FETO, and LULJETA FETO,

*Petitioners*,

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

---

On Petition for Review of an Order of
the Board of Immigration Appeals.
Nos. A79-602-742, A79-602-741, A79-602-740, A79-602-739

---

ARGUED MAY 6, 2005—DECIDED JANUARY 4, 2006

---

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Nderim, Matilda, Endri, and Luljeta Feto, citizens of Albania, arrived in Detroit, Michigan, via Mexico sometime around December 17, 2000, where, as the immigration euphemism goes, they entered the United States "without inspection." About a year later, Nderim Feto filed a request for asylum on behalf of himself and his family, claiming that he was persecuted because he is a kulak (a prosperous farmer) and because of his participation with the Albanian Democratic Party, an opposition political party. His petition was denied and he received a Notice to Appear on December 26, 2001, charging

him with removability. At the removal hearing held on January 16, 2002, Feto conceded removability and requested asylum or alternatively relief under the Convention Against Torture (CAT). The Immigration Judge (IJ) denied Feto's application because he found that Feto had not suffered past persecution. The IJ also made an adverse credibility finding based on conflicts between Feto's testimony at his asylum hearing and his prior written statement. The Board of Immigration Appeals (BIA) affirmed the IJ's decision.

In this petition for review, Feto challenges the denial of asylum and raises a due process claim in connection with the IJ's failure to advise him about his eligibility for voluntary departure and certain other rights. We conclude that the IJ's rulings were supported by substantial evidence and therefore deny the petition for review.

# I

On August 28, 2002, at his asylum hearing, Feto testified that he was persecuted by the Albanian communist regime, which was in power from 1945 to 1990. The communists targeted Feto's family because they were prosperous, landowning farmers. The government confiscated his family's land and forced them to work as farmers on government tracts. At one point, the government forcibly relocated him and his mother to a remote village, in order to punish them after his uncle fled Albania. It prohibited Feto from joining youth organizations, knowing that this would stigmatize him. During his service in the Albanian army from 1979 to 1981, Feto was assigned to a low-level labor unit and was not entitled to have a gun issued to him.

After the collapse of the communist government in 1990, Feto joined the Democratic Party in the belief or hope that the party would return his family's land to them. He participated in several political protests in the late 1990s

and early 2000s, some of which were related to the return of land. Feto provided detailed descriptions of several protests and his arrests in a lengthy written statement that he included with his asylum application; he also testified about them at his hearing. Notably, Feto stated that in 1998 he was arrested and held by the police from January 31 to March 15. In June of 2000, he said that he was one of about 30 individuals who were taken by the police from a Democratic Party rally and beaten in a van. The IJ denied Feto's application for two reasons: first, that the credible events did not amount to past persecution, and second, that his testimony "was generally vague, directly inconsistent with his written application, and . . . appears to have been either fabricated or exaggerated."

The IJ found that Feto's hardship under the communist regime, including his alleged one-month period of detention in 1978, did not amount to past persecution. As the IJ explained, "While it may be true that the respondent's family was forced to perform farming and their land was taken away, I do not find that this treatment rises to the level of persecution in the past." In addition, the IJ found that Feto's testimony was inconsistent with the State Department's Country Profile dated May 2001, which explains that "[w]ith the Socialist Party currently leading a coalition government, it is highly unlikely in today's circumstances that many applicants will have credible claims to political persecution."

With respect to credibility, the IJ made several specific findings. For example, he noted that Feto was unable to recall specific incidents mentioned in his written statement and that his testimony conflicted significantly with the earlier written submission. One discrepancy—perhaps minor standing alone—concerned the purpose of the rally that led to Feto's one-month detention in March 1998. In his written statement, Feto stated that the demon-stration was intended to protest the detention of opposition

political party members. At his hearing, Feto shifted ground and claimed that the protest was over human rights and the return of seized land.

Most damaging to Feto's credibility, from the IJ's standpoint, were several discrepancies between Feto's written statement and his hearing testimony describing various detentions. Feto presented two versions of an incident that occurred on June 13, 2000, when he and a small group of organizers for the Democratic Alternative organized a rally that was broken up by the Albanian National Intelligence Service (SHIK). In version one, recounted in the written statement, Feto claimed that he was arrested and taken to a police station in Tirana, where he was beaten on his head by one agent while another held his hand behind his back. He claimed that he was told by the police that he would not live to see the election if he continued to campaign against the Socialist Party. He was released the following day. Version two came out at the hearing after Feto was asked if he had participated in activities with the Democratic Party or the Democratic Alternative for the 2000 elections. It was not until the questioner prompted him with his written statement that he said anything about the June 13 incident. At that point, he testified that he was put in a van with a few other demonstrators and beaten for 30 minutes and then let go. The IJ could not believe that Feto would fail to recall an ordeal as serious as the one laid out in version one and on this basis discounted Feto's overall credibility.

In another example, the IJ referred to Feto's claim in his written application that on July 25, 2000, Feto and some friends organized volunteers to deliver flyers to raise campaign contributions. Feto claimed that after the rally "[m]y friend and I were the last to leave . . . as we started to walk away A [sic] voice called out: 'I told you that you would not live to see the election' when several gun shots were fired. Although neither my friend or I were

hit we both fell to the ground." When asked about this incident at the hearing, Feto could not recall any incidents that occurred after June 2000. Asked specifically whether he recalled the shooting incident mentioned in his written statement, Feto responded: "These things actually, this happened pretty often, not only this time." When the question was repeated, he responded simply that he did not recall this specific incident.

These were the discrepancies that prompted the IJ to conclude that "there [were] meaningful evidentiary gaps in the respondent's testimony, in his written application and the claim in its entirety that impeach the overall veracity of the story." The BIA affirmed the IJ's decision, issuing a one-paragraph order finding that Feto had failed to meet his burden of establishing "past persecution or a well-founded fear of persecution on account of one of the statutorily protected grounds, or that it is more likely than not that he will be persecuted or subjected to torture upon his return to Albania." Feto then filed a petition for review.

**II**

We review Feto's claims for asylum, withholding of removal, and relief under the Convention Against Torture using the substantial evidence standard. *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003). "Applying that standard, we assess whether the BIA's determination was 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We will overturn the BIA's decision only "if the record compels a contrary result." *Brucaj v. Ashcroft*, 381 F.3d 602, 606 (7th Cir. 2004) (citing *Georgis v. Ashcroft*, 328 F.3d 962, 967-68 (7th Cir. 2003)). We review the BIA's legal conclusions *de novo*. *Ahmed*, 348 F.3d at 615. Where, as here, the BIA basically

adopts the IJ's decision or expresses agreement with it in conclusory terms, we review the IJ's decision directly under the same standards. See *Mousa v. INS*, 223 F.3d 425, 428 (7th Cir. 2000).

Feto can meet his burden only if he demonstrates past persecution or a well-founded fear of future persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); *Tolosa v. Ashcroft*, 384 F.3d 906, 908 (7th Cir. 2004). Here, Feto seeks to rely on his membership in the social group of wealthy landowners known as kulaks, as well as on his political opinions in opposition both to the former communist government and later governments. He argues that the harms that befell him in Albania easily qualified as past persecution, and he tries to excuse the discrepancies in his account with psychological evidence indicating that his failures of recollection were attributable to post-traumatic stress disorder.

In support of the latter point, Feto offered the affidavit of Jordan J. Miller, a fourth-year graduate student of psychology who was working as an extern with the Marjorie Kovler Center for the Treatment of Survivors of Torture and who had treated him. Miller's affidavit included the following opinion about Feto's condition:

> Mr. Feto also manifests anxiety symptoms, including feeling worried, irritability, restlessness, difficulty relaxing, and a decreased ability to concentrate, secondary to intrusive thoughts and memories of the traumatic events. He also stated that he is having difficulty sleeping with early awakenings from nightmares, feelings of terror, and an inability to return to sleep. This constellation of symptoms are consistent with the diagnosis of PTSD, chronic type.

Feto argues that the IJ must not have considered Miller's affidavit, because he did not discuss it in his opinion. Feto

also criticizes the IJ for ignoring other documentary evidence such as a newspaper article that featured certain events of his persecution.

The IJ was not, however, compelled to accept Feto's explanation for the plain inconsistencies in his story. Instead, he was entitled to weigh Miller's opinion along with the other evidence in the case, including his direct observations of Feto at the hearing. Although this court does not function as a rubber-stamp for IJ findings, it remains true that our review is deferential. "The IJ's credibility determinations, as adopted by the BIA, are questions of fact and should only be overturned under extraordinary circumstances, although they must be supported by specific, cogent reasons that bear a legitimate nexus to the finding." *Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005) (citing *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004)). The rule that the testimony of a credible applicant may be enough to meet the burden of proof without further corroboration, see *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003), does not help Feto here, because the IJ found Feto not to be credible and supported that finding with particulars from the record.

Bearing in mind the rule that "[a] reviewing court must uphold an administrative determination in an immigration case unless the evidence compels a conclusion to the contrary," *Kenyeres v. Ashcroft*, 538 U.S. 1301, 1306 (2003) (citing *Elias-Zacarias*, 502 U.S. at 481 n.1, 483-84), we conclude that the IJ's credibility determination is entitled to deference. The remaining evidence of the indignities Feto and his family suffered during the communist era is not so strong as to compel a finding of past persecution. The IJ was therefore entitled to conclude that Feto (and thus derivatively the other members of his family) did not meet the statutory requirement for refugee status.

Feto also raises a due process claim, based on the fact that the IJ did not advise him of various rights spelled out in 8 C.F.R. § 1240.10(a), such as the right to representation, present evidence, and cross-examine the government's witnesses. He also claims that the IJ violated his right to due process by failing to advise him of his right to voluntary departure, 8 C.F.R. § 1240.11(a)(2). At the time we heard this case, the government argued that we lacked jurisdiction to consider this point. The amendments to the immigration laws made by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005), however, have eliminated all doubt about our jurisdiction to consider constitutional and legal claims. See *Hamdan v. Gonzales*, 425 F.3d 1051, 1057 (7th Cir. 2005); *Ramos v. Gonzales*, 414 F.3d 800, 801-02 (7th Cir. 2005). We turn, therefore, to the merits of this part of Feto's petition.

Aliens are entitled to due process during immigration proceedings. *Hasanaj v. Ashcroft*, 385 F.3d 780, 783 (7th Cir. 2004). We review *de novo* claims of due process violations in removal proceedings. *Id*. Before we can reach most issues, however, the alien is required to raise them before the BIA. *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004). The only exception is where the BIA itself would be powerless to address the problem, as might be the case with some fundamental constitutional claims. As we have noted before, however, many due process arguments are based on procedural failings that the BIA is capable of addressing. *Id*. In those instances, the alien must exhaust his or her remedies at the BIA before bringing the claim before this court. Moreover, even if this court can reach an unexhausted claim, the petitioner must prove prejudice in order to prevail. *Roman v. INS*, 233 F.3d 1027, 1033 (7th Cir. 2000).

In this case, Feto was represented by an attorney in his removal proceeding. Compare *Jacinto v. INS*, 208 F.3d 725, 734 (9th Cir. 2000) (finding a due process violation during *pro se* petitioner's removal hearing because the IJ did not

explain to the petitioner her right to testify and present evidence). Feto filed a brief in connection with his appeal to the BIA, yet his brief contains no mention of any procedural flaws in the IJ's handling of the case, much less any of constitutional dimension. The BIA has the power to direct IJs to follow the procedures outlined in the agency's regulations. We conclude, therefore, that Feto had an obligation to exhaust this argument and that his failure to do so prevents us from reaching it.

We add, alternatively, that even if these arguments were not subject to the exhaustion rule, they have no merit. The failure of the IJ to spell out the protections found in 8 C.F.R. § 1240.10 was, if error at all, harmless in Feto's case. He was represented by counsel, the IJ conducted a hearing and heard testimony, and evidence was admitted to support Feto's application. With respect to voluntary departure, the IJ actually did mention it, but only in the course of explaining to Feto that he was not qualified for this option because he did not have valid travel documents and he had not shown that he was willing to depart.

For all these reasons, we DENY the petition for review.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*